The next case on the calendar is Paul Tucker v. Governor of the State of Alabama. Looks like there are some open seats over here for the folks who are coming in on this side. Looks like there are some open seats over here for the folks who are coming in on this side. Looks like there are some open seats over here for the folks who are coming in on this side. Good morning everyone. I don't want to rush anyone if you're still setting up or need more time. I think I'm just about ready, Your Honor. Okay, thank you. The judge will go and may it please the Court. Dr. Marissa Litodinsky, co-lead of the UAB Gender Clinic and Planned Parenthood's expert witness, testified below that mastectomies should not be performed to treat a minor's gender incongruence because, quote, youth must be at a level of maturity and an age where they consent legally to their own care before a very permanent intervention is undertaken. That consent is important, she said, because there are, quote, potentially permanent and irreparable harms that could occur from a transition surgery. The State of Alabama agrees, which is one reason why SB 184 bars sex change surgeries for minors. We also agree with her statement at page 134 of the transcript that sex change hormone treatments also carry risks of, quote, permanent irreversible damage. Indeed, the risks from these treatments are numerous. They include diminished bone density, increased risks of cardiovascular disease, stroke, and diabetes, and what the district court noted on page 3 of its preliminary injunction opinion, loss of fertility and sexual function. The plaintiffs in the United States think that these are acceptable risks for children to face, and the state disagrees. So the question is how to resolve that disagreement. And the answer has always been what the Supreme Court recognized in Wayland v. Roe back in 1977, quote, the state has broad police powers in regulating the administration of drugs by the health professions. Thus, when the Supreme Court upheld a ban on partial birth abortion in Gonzales v. Carhart, the court recognized that, quote, considerations of marginal safety, including balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends. This broad authority to balance risks extends to what Alabama did here. The Constitution does not require states to tolerate risks for pediatric or gender-related medicine that it does not tolerate in any other field of medicine. Regulation in these areas is subject to the same rational basis standard that governs any other regulation in medicine. And because the state has rational, legitimate reasons for prohibiting these risky procedures, plaintiffs' challenges necessarily fail. I'll turn first to the substantive due process ruling of the district court, which we believe is plainly foreclosed by this court's precedent. It's important to understand here is that- I'll just tell you, I think the plaintiff's strongest argument is under the Equal Protection Clause. So, you've only got a limited amount of time. So, if you would jump to that one and skip the substantive due process, I think that would be a wise use of your time. Absolutely. I'll just note, Dovey Public Health Trust, I think, forecloses the substantive due process argument because at page 31 of the brief, they foreclosed any argument that any individual adult or child has a right to these treatments. It cannot be that parents somehow have a right to get off-the-market drugs for their children, otherwise medical marijuana or abortion. Any FDA non-approved drug would be available to parents to get for their kids, but no one else in the general public. And Dovey Public Health Trust forecloses that. Turning then to the Equal Protection Claim. The district court held that the act, quote, categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity. That's simply incorrect as a textual matter. The law on its face does not discriminate against transgender minors or between transgender minors or cisgender minors. It targets only certain dangerous chemical and surgical interventions. So, any child, trans or not, can use puberty blockers to treat precocious puberty or hormones to treat an endocrine disorder. But no child, transgender or not, can use these drugs to affect a cosmetic sex change. The benefits just don't outweigh the risks. Now, the district court deemed that fact to be irrelevant on the basis that only transgender minors are seeking out these transitioning treatments. Just as an initial matter, that's not actually true as a factual matter. It's clearly erroneous. As Dr. Hawkins from the Children's Hospital of Philadelphia testified for plaintiffs, as Dr. Ladinsky from UAB testified, there are children who have taken these transitioning drugs and then later stopped taking them and reidentified with their birth sex. Dr. Hawkins. Why isn't this sex discrimination? I mean, you know, if you look at the face of the statute, it says, I don't know whether it says boys or males, whatever it says. It says, you know, boys can do one thing, girls can't do that thing, and then vice versa. So, why isn't it sex discrimination? I think for the same reason the Mississippi abortion law issued in Dobbs is not sex-based discrimination, even though it said women multiple times in that statute. Because what the Supreme Court has explained every time, at least that we're aware, where medical issues have come up in the equal protection clause context, if we're dealing with a medical condition or a treatment that only one sex can undergo, like in Godoldig, it was pregnancy. In Dobbs, it was abortion. Heightened scrutiny is not triggered there. Yeah, but can't both sex? I mean, this isn't, we're not talking about like a, you know, prostate exam or something like that. I mean, we're talking about something that it seems to me at least, if you define it, it's kind of a definitional issue. If you define it as taking cross-sex hormones, if that's the, or puberty blockers, you know, there are really two things. There's the puberty blockers and the cross-sex hormones. I mean, both sexes can do that, right? So, puberty blockers, I mean, that ban applies to males or females. So, I don't think there's any sex-based discrimination there. Turning to the cross-sex hormones, I think an important point to recognize is that we're dealing with not just one treatment, but two different types of treatments. It's testosterone for the purposes of transitioning, which is a treatment that only females can undergo. If you have a male who wants to transition to female, he can't take testosterone to do that. It's not going to work. Similarly, if you have a girl who wants to transition to boy, estrogen is not going to do that for her. So, we're squarely within that Godoldig and Dobbs framework. We're not in Bostick and Brumby world, where it's possible for a man or for a woman to wear a dress, but only the man is going to get fired. In this instance, it's only possible for girls to take testosterone for the purposes of transitioning. And that is not the same treatment as a boy taking testosterone to treat an endocrine disorder, which is the fundamental premise underlying the district court's decision and the plaintiff's arguments here. Their view is that if you have a boy with abnormally low testosterone, and you give him testosterone to bring him up from a disease level to a normal level, well then, it's the same treatment to give a girl with normal levels of testosterone enough to bring her up to a boy's levels, which is six to a hundred times higher than a healthy girl's levels. We know those are not the same treatments because one, they're for different purposes. One is to treat an endocrine disorder, which is miserable by a blood test. The other is to treat a mental health issue, which is not measurable by a blood test. Second, you've got different practitioners doing it. You can go see your endocrinologist to treat your trigeminal disorder. But what plaintiffs have testified to in the district court proceedings is that if you want to treat gender dysphoria with that same drug, you've got to see a mental health expert. They've got a social worker on staff. They have a reverend. It's a totally different treatment for that reason. And then, of course, there's a totally different risk profile. There's seven pages of risks that UAV has on their informed consent form. That's docket entry 78-41 that a parent has to sign before the kid gets the testosterone to treat the mental health issue. That's not present for a normal endocrine disorder where you're trying to bring a boy up from levels. And this is in the record, Dr. Laidlaw's report 69-3. The normal level of testosterone for a male is about 300 to 1,000 nanograms per deciliter. And for a female, the normal levels are about 10 to 50. Very different. And when you raise the female's levels up to the male level, that's when you start to get these risks of heart disease and of thickening of the blood, increased stroke risk, diabetes, the sort of things that Sidney Wright testified to below had happened to her, and, of course, the loss of fertility and loss of sexual function. So these are total apples and oranges. And I think in any other context, that becomes clear. Indeed, I asked Dr. Ladinsky about this in a different context, and logic prevailed there, where I asked her, if a boy came to you with abnormally low levels, would you send him to an endocrinologist to get the testosterone up to normal? She said, yes, that would be an endocrine treatment. But if another boy came to you and he had normal levels, but he wanted to raise them up to abnormally high levels to a diseased state for purposes of bodybuilding, would you recommend he go see the endocrinologist? And she said, no, that would be a different treatment altogether. Well, of course it would be, and it would also be a crime. If you take a different context and just understand that different drugs are going to interact with different bodies, either because of hormone levels or because of sex. We give this example in the brief. We gave it at the district court. I still haven't heard an answer for it yet. If you take a fertilized egg and you implant it in a female, that's going to be a fertility treatment, potentially. If you do the same thing to a male body, it's not a fertility treatment. It's something altogether different. So unless you embrace that fallacy like the district court did, that because it's the same drug, it must be the same treatment. Unless you embrace that fallacy, you have to reverse. Let's just say we disagree with you on that and we do apply some kind of heightened level of scrutiny here. The district court said in talking about tailoring, the district court said that this law was not remotely tailored. In fact, there were lots of other things that the state could have done if it was concerned about the over-prescription of these kinds of drugs. What do you say about the tailoring issue? When it comes to tailoring, I think this is as peculiar as it can be because the whole point is to try to identify the risky treatments. The way you identify that is are you giving the puberty blockers to move a kid from an abnormally early puberty to a normal one or are you giving it to move him from a normal puberty to an abnormally late puberty for purposes of transitioning? Because you could do Lupron for, I could say, a 10-year-old or a 12-year-old girl who you're trying to prevent the onset of menstruation because she's like a shortened height or they need to have additional time. Right. And so the tailoring, to the extent we have to use the word sex in the statute, I don't think that is outcome-determinant as to whether it's tailored or not. Well, I mean, I guess I think what the district court was indicating in saying that was that you cite Great Britain and France and other countries where they've identified this as a potential problem, but they haven't banned it. They've said, you know, this is only allowed in extraordinary circumstances or they've imposed some sort of heightened requirement to get these kinds of treatments. So why would that not be something that the state should have done here? I think a point from the Endocrine Society, this is 69-19 at 3,876. They said, with current knowledge, we cannot predict the psychosexual outcome for any specific child. And Dr. Hawkins, a plaintiff's expert, agreed on page 70 of the transcript with that statement. So we don't know, even if these are helping kids and the benefits or the evidence suggesting that this is helping anyone is actually going to— there's not good evidence to suggest that these are actually benefiting anyone. Judge Ogo has given me leave to go over time. Not that much, though. Yeah, just a small amount of leave. And this is just a procedural question. So, you know, there are basically two kinds of these preliminary injunction appeals. One kind is where the case is more or less stayed until the court resolves the appeal. The other kind is where there's active trial litigation going on. Which one is this? Is there active trial litigation going on? Two points on that, Your Honor. There is still active litigation, but I did want to note before I sit down, if I may, this Court has recognized repeatedly in cases like Solantik v. City of Neptune Beach, that's 410 F. 3rd 1250, that on a number of occasions when an appeal has come up to the court in an interlocutory posture from a preliminary injunction, and the court resolves legal issues in a way that really renders the rest of the case all but moot, it basically decides the case, the court can and has ruled on the merits. And so we think that would be appropriate in this case, because once you recognize that the state has that same broad police power to regulate all areas of medicine, including gender-based medicine, there's nothing left to decide.  It's to prevent the sterilization of children. So for those reasons, we would ask the court reverse on the merits and order the lower court to dismiss these claims with prejudice. Thank you. You have time remaining for rebuttal. Thank you. Mr. Doss, you're using your full 15 first and then the government? We're splitting 10 minutes and then 5 minutes for the government. Oh, 10 and 5. Okay. Thank you. You may proceed, Mr. Doss. May it please the court. My name is Jeff Doss and I represent the private plaintiffs. This act is unprecedented. Other than this act, no state has attempted to criminalize the standard of care for the treatment of a medical condition. Yet that is exactly what Alabama has done. As the state's own expert acknowledged, nowhere in the world has a government enacted a ban on treatments for gender dysphoria like the one enacted in Alabama. But in doing so, the state has violated a parent's fundamental right, recognized by the Supreme Court for more than 100 years, to make decisions concerning the care, custody, and control of their children. The state has substituted its judgment for that of parents in consultation with their treating physicians to decide what is in the best interest of their children by weighing the exact risks identified by the state of Alabama against the recognized therapeutic benefits that the evidentiary record has revealed. If parental freedom means anything, it means that a parent, not the state, should decide whether their child receives life-saving medical intervention consistent with the standard of care. In addition, this act violates the Equal Protection Clause by discriminating on the basis of sex. On its face, the act deprives minors of essential medical care because of their gender nonconformity. And as this court has recognized, discrimination against transgender people due to gender nonconformity is sex discrimination. And on this evidentiary record, there is no compelling state justification for doing so. So first, the private plaintiffs have shown a substantial likelihood of success on the merits concerning their parental rights claim. I'll just tell you, like I said, on the other side, I think your Equal Protection Claim is much stronger, but if you want to talk about substance of due process, that's fine with me. Where does the right come from here to, do I have the right as an adult to this that then passes on to the child? Where does this come from? I think when we go back to the Supreme Court's precedent dealing with parental rights, and it starts with really Meyer v. Nebraska in 1923. In that case, it was a ban on the instruction of German language in schools, and the Supreme Court struck down or reversed the conviction of the teacher who taught German language based in part on parental freedom. The Supreme Court's analysis was not that children have a substantive due process right to be instructed on the German language, but rather parents have a right to direct their children to go to a school, if they wish, that teaches the German language. In the same way, Pierce v. Society of the Sisters, the 1925 case from the Supreme Court where a law banned private schools, for example, it's not that the Supreme Court was— Yeah, I totally get that, but those are compelled education cases, so the state is requiring those children to go to schools, and the state can't require me to go to school if it wants to, right? So, I mean, that's where those seem different because the law at issue there is saying, you must show up at this place at this time and get this education, and that's something that we let the state do to kids, but we know that we have an association right where they can't tell me that I have to go to your house or to have a particular job, and so I get that, but I don't get how that translates to what we're talking about now. So, also, this court's precedent in Bindeberg, which we've cited in our brief, recognized that there's a substantive due process right on the part of parents to direct the medical care of their children. In that case, the state took custody from the parent, assigned it to a third-party custodian for the purpose of consenting to a controversial medical intervention, and this court, in the Bindeberg decision, held that that presented a tribal issue of fact concerning a substantive due process violation against the parent, not just for deprivation, but for overriding the parent's judgment concerning the medical decisions associated with his child. Could I, as a parent, if a child has an illness and the drug is only available in Mexico and it's not FDA approved, could I insist that my medical provider provide it to the child? I think in that circumstance, there may be a supremacy clause issue overlaying where the federal government is. Well, the due process clause applies to the federal government just as much as it applies to the states. In an experimental drug context, I think that would probably fall in that hypothetical where you have an experimental drug, it may be approved in another country, it's not approved in this country yet. The Supreme Court has addressed that in the context of those experimental drugs, for example, for terminally ill patients. Well, what about if you have a procedure that a doctor has done, not in the United States yet, but in another location in Europe, and it's something that is not necessarily novel, it's a novel treatment, and the state is not going to approve doctors in the state of Florida or Georgia or Alabama to do that procedure. Could I insist upon it because I have a child who needs it? I think the limiting principle perhaps in this case, what we're dealing with on this evidentiary record, is what we have is the standard of care. I mean, it would be the equivalent of banning the standard of care for juvenile diabetes. It's not that the state has picked a competing paradigm. It's that the state is saying the recognized standard of care in the medical community for the treatment of this particular condition is banned. But aren't there, I guess, there's competing testimony or competing experts. There are some experts that say that that is the appropriate standard of care, and there are other experts who say that's not the appropriate standard of care. I think on this record, the state's own expert acknowledged that it's the most widely recognized standard of care. He disagrees with it. He criticizes it, but he does recognize that it is the standard of care. This is not a competing paradigm case where it's a close call. So I do think there is a potential limiting principle here, is that when you have a safe and effective treatment with therapeutic benefit that is the standard of care, then in that context, a parental judgment concerning medical treatment ought to be protected, and any statute related to it should be narrowly tailored to ensure that parents do have that essential core judgment. But turning to the equal protection argument, as the Supreme Court recently explained, it is impossible to discriminate against a person for being transgender without discriminating against that person based on sex. But that was a case involving the workplace in Title VII, correct? Yes, Your Honor. That was the Bostock case. The issue, though, is from Bostock, which was decided after Brumby from this court, Brumby did recognize that discrimination based on gender nonconformity is sex discrimination under the equal protection clause. The state's argument concerning Godaldig and the Dobbs language, what's important to put in context is that Godaldig applies when you are dealing with a facially neutral statute, when the statute on its face does not discriminate on the basis of sex. In the Bray decision from the Supreme Court, footnote 3, Justice Scalia wrote, Godaldig's ruling that a facially neutral benefit plan is not sex-based unless it has shown that distinctions involving pregnancy are mere pretexts, that's the critical distinction we have here. This statute, in Section 4A of this statute, baked into the language of the statute is sex discrimination. It does not disable anyone from receiving estrogen, testosterone, or puberty blockers unless the minor's perception of his or her gender or sex is different than that minor's sex. So on the threshold of the statute, before its bans even apply, you have to find gender nonconformity among the minors. If the minors are not gender conforming, then and only then do the treatment bans come into play. That is materially distinct from the Godaldig point or from the Dobbs point, which the statute on its face is neutral as to sex discrimination. The Eighth Circuit in Brandt v. Rutledge, which we submitted as supplemental authority, reached the same conclusion just this year in affirming the district court in Arkansas's injunction against a similar Arkansas law which civilly penalized doctors, not criminally penalized them. And here we do have a failure. We think this is sex-based discrimination and that there is no compelling justification for it. As the district court found, the state's two stated justifications— Let me ask you just to—let's just say we think there is a justification. What's your argument on tailoring? Yes, Your Honor, I think a good analogy in this context is the opioid cases. The state of Alabama felt that there was an opioid problem, that there was over-prescription of opioids. What did the state of Alabama do? It enacted diagnostic criteria that pain management doctors should have to follow before they can prescribe opioids to make sure that the treatment matched the severity of the condition. And in the same way as I hear the state's arguments—and I see that my time has expired, may I continue? You may answer. Thank you. The state's concerns about over-prescription or their misdiagnosing a child, for example, those can be addressed through tightening these diagnostic standards. That's what Dr. Ledinsky testified about. That's what Dr. Hawkins testified about, that there is a very careful, exacting screening process that goes into the gender clinic at UAB to ensure, for example, that a child in fact has gender dysphoria, that it will be persistent, insistent, and consistent. Low likelihood of detransitioning is the state's worried about. So again, in the pain management context— and that they do have stories where they were not advised of what the treatment entailed and what the repercussions would be? The evidence presented to the district court, Your Honor, was that once they hit puberty, the likelihood of detransitioning was very, very, very, very, very low. I mean, I don't even know if it was even recognized as a risk. It's the children who may express gender nonconformity pre-puberty. Those were the studies that the state submitted, and those were the ones that suggested detransition. I'll just say, on the justification, I think the opioid analogy is the apt analogy, and it helps you on, I think, the tailoring. It kind of hurts you on the justification. But on the justification, given that other countries are also doing something, you know, comparable to this, maybe not similar, but they're doing something like this and tightening up the— I mean, isn't that sufficient for us to say, look, the state has a justification doing this. It's widely recognized around the world that this is a problem. I guess two issues there, Your Honor. First, the district court found, as a matter of fact, that the state had not offered credible evidence to support its justifications, and there's no clear error in that finding. Second, Dr. Ledensky at UAB testified on this exact point. When asked about the competing standards in other countries, her point was the guardrails that existed for that diagnosis process in other countries, those guardrails were not as high as they are in the United States. Those other countries are catching up. And so the tightening up that we're seeing in the diagnostic process in the other countries, that's to align them with the standards already being observed in the United States. It's not that the United States is behind the other countries and they're at the forefront. Those countries are catching up to the high level of standard of care that the United States is already observing, including at the UAB's Clinic for Children. Let me ask you one, if I could, just a moment. So the same question I ask Mr. LaCour, which is what's happening in the district court. When would we need to get our opinion out for it to matter? I think the most recent scheduling order has us being trial ready for the final injunction hearing in the fall of 2023. We're in the midst of that sort of discovery at the moment, Your Honor. Okay, thank you. So fall of 2023? Yes, Your Honor. Is there a summary judgment deadline in that scheduling order or is it going to go straight to a bench trial, do you know? There is a dispositive motion deadline and I apologize, I don't recall that deadline. Okay, that's fine. Thank you. I'm sorry, the fall of 2023 was a trial? Yes, Your Honor. Thank you. Thank you. Good morning. Good morning. May it please the court, Barbara Schwabauer for the United States. SB 184 makes it a felony for parents and doctors in Alabama to help transgender adolescents with gender dysphoria obtain medications that may be medically necessary to keep them from suffering severe physical and psychological harm. Yet these same medications remain lawful for adolescents who are not transgender. This law violates the Equal Protection Clause because it expressly discriminates on the basis of sex, including on the basis of gender nonconformity. And the district court found no evidence on this record to support the state's justifications for that discrimination. The district court's injunction here merely maintains the status quo in Alabama, permitting parents and doctors to seek the best available care for all adolescents without having to face up to 10 years in prison. Can I ask you some questions about the scope of the injunction here? Because I think your presence in this case is not you specifically, but the government's presence in this case is something that affects the scope of the injunction. So I guess I'll just ask you to address why the government needs an injunction, if at all, separately than the plaintiffs. Well, I think the court granted the same relief to the plaintiffs in the United States, which is enjoying the specific provisions that are being challenged here. Yeah, but this is not a class. So, I mean, the plaintiffs here are a specific subset of people. You are not a subset of people. So that's the difference. The United States' interest here is the public interest and the government's interest in ensuring that everyone experiences the equal protection of laws. And that's exactly what the statute we intervened on contemplates, that the government has an interest when the equal protection rights are at issue, that the Attorney General has certified this is a matter of public importance, and our interest is broader than the individual plaintiff's claims. It applies more broadly, and for that reason, the scope of the injunction is complete relief to the United States. Mm-hmm. Yeah, so, I mean, as the United States, you would say that – well, let me ask you this. So the statute that you used for intervention says something to the effect of you can intervene in a case that you could have brought. You can intervene in a case that you could have brought. How would you have brought this case? I don't think, Your Honor, that that's the correct language from the statute. I think the statute says that the relief the United States can seek would be as if it had brought the case itself. Okay, that's what I meant, yeah. So I think that the United States is basically that statute puts us in the position of plaintiffs in this case. It gives us the authority to intervene with an equal protection claim. Well, I guess my point is so that it connects it up with if you had brought the case or – I mean, I'm not exactly, but, you know, sort of saying you can intervene in a case that exists and then you can seek the relief that you would get if you had brought the case. I'm trying to figure out what that means, you know. So are you saying that you can get the same relief as the plaintiffs? Are you saying you could get the same relief as if you had brought the case? That's correct, Your Honor. So under what statute would the United States sue a state government for something like this? Well, I agree, Your Honor, there's not an independent statutory authority. This is intervening authority. But I think the statement in the statute about the scope of relief the United States gets suggests that the United States stands in the place of a plaintiff and that they can obtain the type of relief that's appropriate. And in the context – And I guess that's what – and I don't disagree with you. I guess what I'm trying to figure out is you get the kind of relief that would be appropriate for a plaintiff. Is it the kind of relief that would be appropriate for the plaintiff, the individuals, or is it something different than that? No, Your Honor. It's the relief that the United States can get as a plaintiff. Right. And so in that – And so what case would we look at to try to figure out what relief the United States could get as a plaintiff? I guess what would we look at to figure that out? Well, I think in terms of looking at the scope of the preliminary injunction, the interests that have to be – there has to be complete relief to the plaintiff when we're looking at the scope of a preliminary injunction. Because, I mean, it's a little confusing to me because sometimes the government, if you come in in a civil case, which is what this is, it would be like a ketan proceeding. Okay? But there's a statute for that. So it's a little confusing that the government is here as an intervener against the state. I think – You admit that it's unusual. Well, I don't think it's unusual in the sense that Congress contemplated that the United States has an interest in protecting, ensuring that equal protection is enjoyed by everyone who lives in this country. And to the extent that there are other cases in which the United States has intervened, certainly in the education context there are a number of cases in which you can find this statute has been utilized. But the statute contemplates that the United States does have an interest and does have an interest that needs to have complete relief with respect to a preliminary injunction. Right. So let me ask you – can I ask – Yes, go ahead. So I just – and I realize this is – I interrupted the question. So in some statutes, in some statutory schemes, what happens is an individual is suing. So the employment discrimination context, for example, an individual can bring their own lawsuit or the United States can basically bring a lawsuit on that individual's behalf. I think it's your argument that that's not what's going on here, that something different than that is going on here. Well, there's definitely independent authority under Title VII for the United States to bring its own claim when a plaintiff does not bring a claim or if there's a pattern or practice claim. But then it would be the agency, the EEOC, right? Yeah, but in those – Or the United States. Right. Yeah, but in those circumstances, right, the relief that the United States is seeking is the same relief that an individual plaintiff would have sought, right? In those cases, the statute has an explicit set of what relief is available. But even the Supreme Court has recognized that in a Title VII case, the United States' interest is broader than that of individual plaintiffs. So it can seek relief that does not apply to an individual plaintiff, that they don't stand in – the United States is not standing in the shoes of the individual plaintiff who's been harmed. It is also representing the public interest and vindicating the public interest in ensuring equal employment. So those are not coterminous in that regard, and the United States can get broader relief. I see that my time is up. I just wanted to say that we ask that this Court affirm. Thank you. Thank you. Thank you both. Thank you, Your Honors. A few quick points. The May 4th transcript, page 31, DOJ, in trying to get intervention to this case represented to the lower court, the DOJ was not seeking more relief than the private plaintiffs because they are barred from seeking any more relief already. What page? Page 31, May 4th. Standards of care was addressed by my friend, Mr. Doss. The American Psychological Association, this is docket entry 69-25 at page 2 of the ECF pagination, made clear that WPATH's so-called standards of care are actually just guidelines. Endocrine Society calls theirs guidelines. The American Psychological Association has guidelines. Those are different than standards of care. They are more aspirational. They are not standards. Those are different things and takes more evidence to establish standard of care. So factually incorrect. So addressing this idea that I think one way of understanding why hiding scrutiny doesn't apply here is to imagine a discriminatory treatment where children are trying to change the appearance of their race and they're being harmed by that. In the state that this makes no sense, the risks outweigh the benefits. We are going to bar using skin grafts to change the appearance of someone's race. We can still use them for bird victims. That wouldn't require us to meet strict scrutiny. And by the same token, it doesn't require us to meet intermediate scrutiny simply because these drugs are being doled out by a gender clinic as opposed to a performance-enhancing drug clinic. And we know that, too. If you look at 18 U.S.C. 116, that's the federal government's criminal ban on female genital mutilation. The fact that it has the word female in there doesn't mean that you have to meet intermediate scrutiny before you prosecute somebody for that act. The relevant factor is the risk, not the sex of the person. And my friend on the other side suggested that we are discriminating based on gender nonconformity. That is just simply not true. The law does not prohibit any sort of therapy. It doesn't require that males go by he or that girls wear dresses. All it does is target the risky treatments. This is a treatment-focused statute. Just like in DOBS, you're dealing with a particular treatment, not sex. And there is no reason why the state that can generally regulate medicine, subject only to rational basis, and has the prerogative and the expertise to balance risks, as the court said in Gonzales, somehow has to protect kids with one hand tied behind their back simply because these drugs are coming out of a gender clinic and not out of a performance-enhancing drug clinic or in some other medical context. There's no case law that defends that. It makes no sense. I think this is squarely controlled by cases like Godoldig and by DOBS, not by employment discrimination cases like Brumby where sex was absolutely irrelevant. And for those reasons, SB184 is lawful and plaintiff's claims should be rejected. Thank you. Thank you all. Have a good day. Thank you.  Thank you. I'm beginning to think everybody wasn't here for the formal remedies case. Yeah, I thought everybody was here for property holdings. No? No? I'm afraid not. Do you want me to get them back? I can. You know, an audience would be nice. There's some coming in, so. I knew I had followers. Here they come. Could you all please come in and sit down? Can we close the door, please? Thank you.